UNITED STATES OF AMERICA,

      Plaintiff,

v.                              **Case No. 18 CR 154**

VAN L. MAYES,

      Defendant.

## MEMORANDUM IN SUPPORT OF MOTION TO DISCLOSE IDENTITY OF INFORMANT AND RELATED DISCOVERY

The defendant has moved to compel disclosure of the identity of all informants and declarants, whose names have been withheld by the government.

### PROCEDURAL HISTORY

The defendant was charged in a five count indictment with: Count 1: Attempted Arson, in violation of 18 U.S.C. §844(I) and 2; Count 2: Conspiracy to Commit Arson, in violation of 18 U.S.C. §844(m) and 2; Count 3: Possession of a Destructive Device in Relation to a Crime of Violence, in violation of 18 U.S.C. §924(c)(1)(B)(ii); Count 4: Possession of a Firearm/Destructive Devices by a Prohibited Person, in violation of 18 U.S.C. §922(g)(1) and 924(a)(2); and Count 5: Making a Destructive Device, in violation of 26 U.S.C. §5822, 5861(f), and 18 U.S.C. §2.

On October 8, 2020, the grand jury returned a superseding

1

indictment in this matter. The superseding indictment charged the following: Count 1: Conspiracy to Commit Arson, in violation of 18 U.S.C. §844(m) and 2; Count 2: Using a Cell Phone to Encourage Others to Riot and Commit Arson, in violation of 18 U.S.C. §2101(a)(2) and (3) and 2; Count 3: Possession of a Destructive Device in Relation to a Crime of Violence, in violation of 18 U.S.C. §924(c)(1)(B)(ii); Count 4: Taught Others the Use, Application, and Making of Molotov Cocktails in Furtherance of Civil Disorder, in violation of 18 U.S.C. §231(a)(1) and 2; Witness Intimidation, in violation of 18 U.S.C. §1512(b)(3) and (k), and 2 Count 6: Possession of a Firearm/Destructive Devices by a Prohibited Person, in violation of 18 U.S.C. §922(g)(1) and 924(a)(2); and Count 7: Making a Destructive Device, in violation of 26 U.S.C. §5822, 5861(f), and 18 U.S.C. §2.

Mr. Mayes was indicted for the alleged conduct arising from the civil unrest which occurred between August 13 and 16, 2016, in the city of Milwaukee, Wisconsin. Mr. Mayes, and other unnamed individuals, are alleged to have conspired to firebomb the Seventh District police station by using Molotov cocktails. A review of the discovery reveals that the government's conspiracy case, as it relates to Mr. Mayes, is, in large measure, reliant upon government informants and cooperators. Each of the individuals allegedly involved became known to law enforcement within days, or weeks, after the August 2016 events.

2

In the afternoon hours of August 13, 2016, an incident
occurred, wherein a young black man was shot by police in a
neighborhood which abuts Sherman Park in the City of Milwaukee. The
occurrence drew immediate response by community members, as well as
others throughout Milwaukee. Questions surrounded the shooting
regarding the way in which it occurred and whether it was
justified. Van Mayes arrived at the scene very shortly after being
notified that the shooting had occurred. Mr. Mayes was and is, a
community activist who ran a program in Sherman Park for young men
and women: Program the Parks. This organization provided food,
mentorship, and activities in various forms for youth in the inner
city. By various accounts, when Mr. Mayes arrived at the cordoned
off crime scene, he assisted the police in controlling the crowd
which had, by that time, become significantly agitated. He
attempted to broker between the police and the deceased's
relatives, an opportunity to view the young man, who still was
lying in a yard.

In the evening hours of August 13, elements both within the
community and outside of Milwaukee, began to assemble and voice
their opposition, to what was believed to be an unjustified
shooting of a young black male. As the evening progressed, the
crowd became more agitated, louder, and more aggressive. The
composition of the individuals who were expressing their concern
and/or anger varied from location to location. At one juncture, a

3

BP station, situated on the corner which abuts Sherman Park, was set on fire and completely destroyed. During the evening, other incidents of arson, destruction of property, and physical assaults occurred. Commercial properties were entered, looted, and rendered unusable. They include a beauty supply store, cell phone outlet, bank, and grocery store.

During the arson of the BP station, two noteworthy events occurred. The employees of the station attempted to hide in the register area to avoid the crowd and the violence. Witnesses have stated that Mr. Mayes assisted in saving and rescuing the employees from immediate danger. Additionally, a camera crew from a local newspaper was chased by an angry group of individuals. Mr. Mayes again, is credited for saving these individuals from assault and removing them to safety.

Witnesses who viewed the BP arson have stated that the conflagration was initiated by use of an inflaminate, and more particularly, Molotov Cocktails. Various witnesses have indicated that Charles Edwards was responsible for bringing the incendiary devices to the station and distributing them to those who used them as weapons against the station. The prosecution does not allege that Mr. Mayes participated in acts of arson which occurred on August 13 or 14, 2016.

Other events occurred on August 14, 2016 which reflected the state of unrest in the City of Milwaukee. They are now referred to

4

as the riots of 2016. The National Guard intervened at the request
of the Governor. There was vast media coverage throughout much of
the country. The specifics of the allegations in the instant
indictment are that Mayes conspired with Edwards and other adults
and juveniles to engage in a plan by which the Seventh District
Police Station would be attacked. It is theorized that rocks would
be thrown at police officers who were standing guard over the
station. This conduct, according to the plan, would create a
diversion, which would allow the building itself to be attacked by
Molotov Cocktails, which were to be thrown by members of the
conspiracy.

Through the course of the investigation, witnesses have
claimed that the intended assault on the precinct did not take
place because one or more individuals believed the police presence
to be too significant. They maintained that the attack was called
off when considering these observations. It is further the claim of
the prosecution that the assembly of the Molotov Cocktails occurred
on the evening of August 15, 2016 at Charles Edwards' apartment and
that the defendant provided empty glass bottles from his home, or
from events at Sherman Park, together with material to be used as
wicks for the devices. The conspirators, according to the
government, include a variety of adults and juveniles.

Mr. Mayes has, at all times, denied involvement in the plan.
However, various individuals have given statements which directly

implicate Mr. Mayes in the planning the assault, as well as acquiring and assembling the incendiary devices. Witnesses have maintained that he enlisted the juveniles with whom he interacted in the youth program at Sherman Park. At least one of the CIs has stated that Mayes had plans of violence for the City of West Allis.

Several weeks after the conspiratorial evening at Edwards' residence, Edwards was arrested in Sherman Park. Edwards is a paraplegic, who was at all times confined to an electric wheelchair. According to the witnesses, he fancied himself to be one of the leaders in Sherman Park's youth programs and a guiding force for the participants. His arrest occurred when his wheelchair upended while he was in the park. His belongings, which included a quantity of cocaine and a firearm, fell to the ground. Edwards was a convicted felon who is prohibited from ever possessing a firearm. From this incident, the federal government charged him in Eastern District of Wisconsin Case No. 16-CR-159, through various formulations of indictment with Unlawful Transportation of a Firearm; Conspiracy to Commit Arson; 924(c); and Distribution of a Controlled Substance. Edwards, who has now become a cooperator for the government, has implicated Mayes as one of the principles in the conspiracy. Through an agreement with the government, the terms of which have been sealed, Edwards has plead guilty to some offenses and his sentencing remains open ended.

As the investigation progressed, many individuals were

6

interrogated in custodial settings, while others were interviewed in a non-custodial status. Some of the individuals claimed to have knowledge of Mayes' direct involvement, in that they were present at the time the plot was hatched and the bombs were made. Others claim to have indirect information which inculpates Mayes in the acts themselves, or the planning of the events. There is yet another group of individuals who when questioned, either directly excluded Mayes as a participant, or did not name him as a person who was present or involved. These individuals' statements are clearly exculpatory.

Various individuals who have given statements, both inculpatory and exculpatory, were juveniles at the time. At least one individual was interrogated on three occasions after being placed in custody at the Milwaukee County Juvenile Detention Center for unknown charges. Other juveniles may have delinquency records or C.H.I.P.S. (Child in Need of Protective Services) petitions, in relation to the events of 2016 or other matters. For the defendant, juvenile records are only obtainable through the procedure set forth in *State v. Bellows*, 218 Wis.2d 614 (Ct. App. 1998). The process in *Bellows* requires a formal application to the juvenile court, which will evaluate the need for disclosure of the information contained in the file. Obviously, no records can be requested, or ultimately obtained, if the identity of the child is unknown. The records contain a potential treasure trove of

7

information about the child's history, prior record, and other factors which impact on credibility. They may also contain information directly related to the instant charges, including statements about Mr. Mayes' involvement or lack thereof.

### INCULPATORY STATEMENTS

The following is a summary of some of the statements made by the confidential informants which purportedly implicate Mr. Mayes in the conspiracy:

1. **REDACTED**

Case 2:18-cr-00154-PP-WED   Filed 05/21/20   Page 8 of 29   Document 76

2. **REDACTED**

3. **REDACTED**

4. **REDACTED**

9

5.    **REDACTED**

10

6.     **REDACTED**

7.     **REDACTED**

8.   **REDACTED**

9.   **REDACTED**

12

10. **REDACTED**

13

11. **REDACTED**

12. **REDACTED**

13. **REDACTED**

14

14. **REDACTED**

15

15. **REDACTED**

16. **REDACTED**

16

17. **REDACTED**

17

Case 2:18-cr-00154-PP-WED   Filed 05/21/20   Page 17 of 29   Document 76

18. **REDACTED**

18

19. **REDACTED**

19

## EXCULPATORY STATEMENTS

In addition, there are a number of individuals' statements whose statements would be considered exculpatory:

1.  **REDACTED**

2.  **REDACTED**

3.  **REDACTED**

4. **REDACTED**

21

5.    **REDACTED**

6.    **REDACTED**

22

7.   **REDACTED**

23

8.   **REDACTED**

9.   **REDACTED**

10.  **REDACTED**

11.  **REDACTED**

12.    **REDACTED**

13.    **REDACTED**

25

14.  **REDACTED**

15.  **REDACTED**

**ARGUMENT**

The witnesses described herein have provided information on a number of different topics. Some of them directly implicate Mr. Mayes in the planning or the physical assemblage aspects of the conspiracy. Some of the witnesses specifically inculpate other defendants before, during, or after the events of the evening of August 15, 2016. Other witnesses directly inculpate Edwards in the fire bombing of the BP. Various informants are juveniles whose records can only be obtained through the *Bellows* process previously noted.

The individuals, who when specifically asked about the participants, did not name Mayes, have effectively exculpated Mayes. Clearly, when there are a group of individuals present at the time a plan is designed or carried out, some of whom exculpate the defendant and some of whom inculpate the defendant, their identities must be revealed. Witnesses who were asked to identify those present, and who failed to designate the defendant as a participant, have similarly provided exculpatory information. Each of these people must be fully investigated to determine credibility.

The government may seek admission of the unidentified witness' statements on the theory that they can provide historical context or other direct evidence. Under any theory, the defendant is entitled to know the identity of his accusers so as to determine,

27

in advance of trial, the accuracy and truthfulness of their accusations. If, by example, this were a drug conspiracy case based upon conversations captured through T-III authorized monitoring; an admission by the defendant; controlled buys with the defendant; DNA evidence; fingerprints; or drug notes, the co-conspirator's and CI's statements might have less importance. Here, however, the need to identify the witnesses is much greater because many of the statements of the cooperators are not made with sufficient particularity; are conflicting; are internally inconsistent; and because+ there is often no corroboration.

It is essential that the defense have an opportunity to engage in meaningful investigation, so as to determine the credibility of the informants and declarants. The government's extensive reliance on the statements of the CIs, as evidence against Mr. Mayes, makes the need for disclosure of their identities more compelling. Without such disclosure, counsel will have little opportunity to effectively prepare for trial.

Mr. Mayes has shown a genuine need for immediate disclosure which outweighs the public interest of keeping the CIs identity secret. See *United States v. Valles*, 41 F.3d 355, 358 (7th Cir. 1994)(internal citations omitted). In this case, the crime charged is serious with substantial penalties. Mr. Mayes' defense may lie entirely upon his ability to sufficiently cross examine the government informants. The possible significance of the informers'

28

testimony cannot be overstated.

Ultimately, when the disclosure of an informer's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro v. U.S.*, 353 U.S. 53, 60-61 (1957). In such a situation, the trial court may require disclosure, and if the government still refuses to disclose the identity of the CI, the court may dismiss the case. See *Id.* at 61.

Based on the foregoing considerations, Mr. Mayes hereby moves the court to order the government to disclose the identities forthwith.

Dated at Milwaukee, Wisconsin, this 21st day of May, 2020.

Respectfully submitted,

/s/ *Robert G. LeBell*

Robert G. LeBell, SBN: 01015710
Attorney for Defendant
1223 N. Prospect Avenue
Milwaukee, WI 53202
(414) 276-1233
Fax: (414) 239-8565
dorbell@ldm-law.com

29