UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

      Plaintiff,

v.

                                             Case No. 18-CR-154

VAN L. MAYES,

      Defendant.

---

**THE UNITED STATES' RESPONSE TO THE DEFENDANT'S MOTION TO DISCLOSE WITNESS IDENTITIES**

---

The United States has met all of its discovery obligations and followed the normal redaction process. The United States redacted the identifying information of certain witnesses and innocent parties because Van Mayes has repeatedly intimidated and interfered with witnesses and abused the trust of children who he mentored when he encouraged them to attack police and taught them how to make Molotov cocktails. Importantly, a grand jury indicted Mayes with a conspiracy to intimidate, threaten, and corruptly persuade witnesses. Because these witnesses are protected as confidential informants and due to significant safety concerns, the government requests that this court deny the defendant's motion to disclose the witnesses' identification information.

**I.    Background**

On or about the evening of August 15, 2016, Van Mayes asked adults to gather

some children from the Sherman Park neighborhood so that they could meet and plan a firebombing of a Milwaukee Police Station and homes in West Allis. In front of children (many to whom Mayes was a mentor) and adults, Mayes made Molotov cocktails by pouring gasoline into glass bottles and placing fabric wicks into the tops. Mayes' plan was to have the children create a diversion by throwing rocks at police; then at the same time, adults would throw the Molotov cocktails at a Milwaukee Police Station and at residential homes in West Allis "where white people live." Several citizen witnesses have provided information regarding Mayes' criminal activities connected to this event. Mayes' statements and video evidence corroborate that his motive was hatred towards the police. Evidence also shows that Mayes attempted to intimidate and interfere with witnesses against him.

Through the pendency of this investigation and post-indictment, Mayes has made multiple attempts to intimidate and interfere with witnesses: (1) Mayes and others attempted to interfere with the investigation by lying to law enforcement; (2) Mayes said he compiled a list of people who received federal subpoenas to testify and intended to expose those witnesses; (3) Mayes said that once he confirmed the name of one particular witness in his discovery, he wanted "something done" about that witness; (4) Mayes' associate said that s/he was gathering all the witnesses who could be identified in the criminal complaint to develop a story to protect them all from prosecution; (5) one witness was physically assaulted by an unknown assailant because of his/her cooperation; and (6) Mayes has posted intimidating video messages, referring to citizen

witnesses as "snitches" and threatening to find out who made statements to law enforcement. Due to safety concerns, the United States Attorney's Office has provided protective resources to some witnesses.

Photograph One below is a still photograph from one of Mayes' 2016 social media videos referencing civilian witnesses as "snitches." Photographs Two and Three below are recent still photographs from Mayes' Facebook Live account. In Photographs Two and Three, Mayes is dressed in a tactical vest and has a gun on his person – it is believed it was a pellet gun. Photograph Three is from a June 23, 2020 Facebook Live video where the defendant live-streamed an incident in which he and others went to a Milwaukee residential home and insinuated a child abduction crime was occurring at that house – these residents did not commit any of the crimes of which Mayes was accusing them. Sadly, the result was the residents were targeted, shots were fired, and the home was set on fire by two suspects that same day. Again, this highlights Mayes' willingness to encourage extralegal activities to achieve his ends. This issue is addressed in a separate statement to the court provided by U.S. Probation.

**PHOTOGRAPH ONE**



**PHOTOGRAPHS TWO AND THREE**

 

For clarification purposes, Mayes identified thirteen sources of information (SOI-1 through SOI-13)[1].

- SOI-1 ("September 6, 2016 Custodial Interview ATF Agents Newport and Tanem of Unnamed Individual"). Dkt. #76, page 8. This witness stated that around August 15, s/he saw Van Mayes with a bag of rocks that were intended to be thrown at police officers, and s/he saw Mayes make Molotov cocktails. This witness also said that s/he saw the rioting that occurred at several locations in Milwaukee on August 13, and s/he heard that a co-conspirator of Van Mayes had Molotov cocktails on August 13.

---

[1] The government and defendant agree that the "September 16, 2016 Custodial Interview by MPD of Unnamed Individual" in the defendant's motion was included in error, so it will not be addressed. Dkt. #76, page 20.

- SOI-2 ("September 14, 2016 Custodial Interview by ATF Agents Mason and Randazzo of Unnamed Individual"). Dkt. #76, page 9. This witness provided information about rioting activity on August 13. This witness said that s/he saw Mayes and others around the Sherman Park BP Gas Station (BP Station)[2] on August 13. The witness explained that s/he participated in the looting, and s/he and others threw Molotov cocktails while at the gas station. The witness said adults were handing out Molotov cocktails at the BP Station, one of which was Mayes' co-conspirator from his August 15 crimes. This witness provided no information regarding the crimes with which Mayes is currently indicted.

- SOI-3 ("December 30, 2016 Interview by ATF Agent Hankins and Milwaukee County Sheriff Todd Rosenstein of Unnamed Individual"). Dkt. #76, page 9. This witness said that s/he was aware of Mayes' Program the Parks group (This was Mayes' youth mentorship program. Mayes used his connection to children from this group when he devised his August 15 Molotov cocktail plan). The witness discussed people associated to that program and its recycling practices. The witness also said that s/he saw rioting on August 13, including seeing the arson at the BP Station. This witness was taken into police custody on August 14, so s/he provided no information regarding the crimes with which Mayes is currently indicted.

---

[2] This gas station was eventually burned down by rioters on August 13, 2016.

- SOI-4 ("ATF report, number 25, investigation no. 778020-16-0066" and "July 20, 2017 Proffer Interview by ATF Agent Mason of Unnamed Individual"). Dkt. #76, pages 9-10, 24-25. This witness provided information about rioting activity on August 13. This witness saw Mayes and others at the BP Station on August 13. The witness said that Mayes and others kicked in the door to the BP Station, which allowed for looting at the location. At the BP Station, the witness saw Mayes with a co-conspirator who the witness said was handing out Molotov cocktails. This witness provided no information regarding the crimes with which Mayes is currently indicted.

- SOI-5 ("January 26, 2017 Interview by ATF Agents Hankins and Rorabeck of Unnamed Individual"; "February 1, 2017 Interview by ATF Agents Hankins and Rorabeck of Unnamed Individual"; "July 16, 2018 Interview ATF Agents Hankins and Lindeman of Unnamed Individual"; and "May 13, 2019 Interview by ATF Agents Hankins and Greenwich of Unnamed Individual"). Dkt. #76, pages 10-11, 14, and 18-19. This witness discussed the recycling practices, the purpose, and the people associated with Mayes' Program the Parks group. On August 13, the witness saw the BP Station arson from a distance. This witness heard from a Mayes' associate that Mayes and others lied to law enforcement about making Molotov cocktails and had "covered up" some of the evidence. After Mayes was indicted, this witness heard from a Mayes' associate who said that s/he was gathering all the witness that they could identify in the criminal complaint to develop a "common story" to protect them

all from prosecution. This witness also heard Mayes say that he was going to expose witnesses against him and that the children who were present during the making of the Molotov cocktails would be loyal to him.

- SOI-6 ("February 28, 2017 Proffer by Milwaukee County District Attorney of Unnamed Individual"; "October 5, 2016 Custodial Interview by ATF Agents Hankins and Connors of Unnamed Individual"; "October 13, 2016 Interview by ATF Agents Connors and Hankins of Unnamed Individual"; "October 18, 2016 Interview by ATF Agents Connors and Hankins of Unnamed Individual"; and "January 27, 2017 Proffer by ATF Agents Hankins and Randazzo of Unnamed Individual"). Dkt. #76, pages 11-12, 20-22, and 23-24. This witness explained that Mayes' Program the Parks did not recycle bottles. This witness said that on August 13, s/he was rioting at the BP Station, and s/he saw Mayes video recording the looting. This witness said that around August 15, s/he was at a residence and was aware of a plan to have children throw rocks at police while adults attacked a police station with Molotov cocktails. The witness saw Molotov cocktails being made, but could not see everyone's face and did not recall if Mayes was there.

- SOI-7 ("December 7, 2017 Proffer Interview by ATF Agents Hankins and Mason of Unnamed Individual"; "January 23, 2018 Proffer by ATF Agent Hankins"; "January 23, 2018 Facebook messages"; "November 9, 2018 Interview by ATF Agent Hankins

of Unnamed Individual"[3]; "July 19, 2019 Proffer Interview by ATF Agent Hankins of Unnamed Individual"; "January 8, 2018 Proffer by ATF Agents Hankins and Barker of Unnamed Individual"; and "January 16, 2018 Interview by ATF Agent Hankins of Unnamed Individual"). Dkt. #76, pages 12, 13-14, 16, 19-20, and 25-26. This witness discussed Mayes' Program the Parks group and the people associated with it. This witness also explained that around August 15, s/he participated in the illegal activity of making Molotov cocktails. The witness saw Mayes, and others, make Molotov cocktails and heard the plan discussed by several people, including Mayes, to firebomb a Milwaukee police station and attack the south side. The witness explained that s/he was physically assaulted by one of Mayes' associates after the perpetrator asked the witness if s/he was cooperating with police. The witness also saw and heard Mayes use a cellphone to coordinate a meeting during the Molotov cocktail discussions.

- SOI-8 ("August 7, 2018 Interview by ATF Agents Hankins and Lindeman of Unnamed Individual" and "August 14, 2018 Interview by ATF Agent Connors of Unnamed Individual"). Dkt. #76, pages 14-15, 16. This witness discussed recycling efforts by Mayes' Program the Parks group. This witness also discussed Mayes' anger towards police, and that s/he heard that the plan to make Molotov cocktails came from Mayes. The witness also said that if anyone came up with a plan of violence against the police,

---

[3] The correct date for this statement is June 1, 2018. Dkt. #76, page 16.

it would be Mayes. This witness stated that Mayes told him/her not to talk on the telephone. This witness provided no firsthand information regarding the crimes with which Mayes is currently indicted.

- SOI-9 ("August 10, 2018 Interview by ATF Agents Hankins and Connors of Unnamed Individual"). Dkt. #76, pages 15-16. This witness heard Mayes direct others to make Molotov cocktails and this was done in front of children. SOI-9 also saw Mayes getting the materials to make Molotov cocktails and heard a group, which Mayes was part of, discussing the plan to use the weapons at a police station. After Mayes was indicted, SOI-9 heard Mayes say that once he confirmed the name of a particular witness in his discovery, he wanted "something done" about that witness.

- SOI-10 ("February 12, 2019 Proffer by ATF Agent Hankins of Unnamed Individual"; "January 4, 2017 Interview by ATF Agents Hankins and Arnold of Unnamed Individual"; and "November 27, 2018 Interview with ATF Agent Hankins of Unnamed Individual") Dkt. #76, pages 17-18, 22-23; and 26. This witness discussed Mayes' Program the Parks group and the people associated with it. This witness also explained that around August 15, s/he was present for the planning and the making of Molotov cocktails. The witness said that Mayes was making Molotov cocktails in front of children and others, and Mayes told a group of adults and children about his plan. Mayes told the group that he wanted children to throw rocks at one police station to create a diversion, and while that diversion was occurring, others including

9

Mayes would firebomb another police station and set fires to homes in West Allis "where white people live." After the Molotov cocktails were made and the plan was finalized and agreed upon, this witness stated that s/he convinced Mayes not to execute his plan.

- SOI-11 ("September 1 2016 Interview by ATF Agents Barker and Rorabeck of Unnamed Individual"[4]). Dkt. #76, page 20. This witness discussed prior acts of drug dealing by one of Mayes' co-conspirators. This witness provided no information regarding the crimes with which Mayes is currently indicted.

- SOI-12 ("February 9, 2017 Interview by ATF Hankins and Rorabeck of Unnamed Individual"). Dkt. #76, page 24. SOI-12 said that s/he was present at the BP Station on August 13. This witness provided no information regarding the crimes with which Mayes is currently indicted.

- SOI-13 ("July 6, 2017 Interview by ATF Agents Haskins and Barber of Unnamed Individual"). Dkt. #76, page 24. This witness discussed events from the BP Station arson on August 13. This witness said that s/he and another man saved a white couple and a reporter from being attacked.[5] This witness provided no information regarding the crimes with which Mayes is currently indicted.

---

[4] The correct date for this statement is August 30, 2016. Dkt. #76, page 20.

[5] The defendant incorrectly stated that this witness identified Mayes as assisting the white couple and the reporter. The witness actually said that s/he assisted those people, not Mayes.

## II. There Is No Legal Basis to Deviate from the District Court's Regular Procedures and Require Early Disclosure of Witness Information

If a trial is conducted in this case, the defense will have a right to cross examine the witnesses the government calls at trial and to pretrial disclosure of those witnesses' names. This District Court has already established a procedure for when the United States must provide those witnesses' names: "seven days prior to the final pretrial conference date." *See* Tips for Parties Practicing before Judge Pepper, Section VII.A., available at http://www.wied.uscourts.gov/sites/wied/files/documents/Judge_Pepper_tips_5-24-18.pdf. There is no legal authority – under the Constitution, the Rules of Criminal Procedure, or the Local Rules – to require the United States to disclose the full name of government witnesses before then. *See, e.g., United States v. Delatorre*, 581 F. Supp. 2d 968, 980–81 (N.D. Ill. 2008) (rejecting a claim that a defendant was "entitled to a new trial because the Court improperly denied his motion for pretrial discovery of the government's witness list" and stated that the "argument [was] without merit" because "throughout trial, the government provided to defense counsel one week in advance the list of upcoming witnesses and complete copies of their statements, including their names").

There is no general constitutional right to discovery in criminal cases. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case."); *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996) ("There is no constitutional right to pretrial discovery.") (citing *Wardius v. Oregon*, 412 U.S. 470, 474

(1973)); *United States v. Johnson*, No. 11-20551, 2012 WL 1230138, at *1–2 (E.D. Mich. Apr. 12, 2012) ("Defendant Johnson's contention that under 'our system of justice [a] defendant should have the names of his accusers and the information they claim to inculpate the defendant sufficiently in advance of trial in order to prepare a defense' *is simply wrong*.") (emphasis added); *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 4009883, at *2 (N.D. Cal. Oct. 13, 2010) (ordering that officer names and the dates of various events be unredacted, but noting the self-evident fact that "the name of the witness . . . should remain redacted for safety reasons"). [6] As a result, Mayes has no constitutional entitlement to obtain government witnesses' full names now, nor is the government violating any of Mayes' rights by redacting sensitive witness information from discovery. *See United States v. DeRobertis*, 766 F.2d 270, 274 (7th Cir. 1985) ("There is no constitutional right to discover evidence favorable to the state in a criminal case, so the inability of a defendant to interview witnesses is a constitutional problem only if the state 'artificially restricted' the defendant's ability to obtain evidence.").

The United States cannot artificially restrict a defendant's ability to have his defense team go out into the world and obtain evidence. So, for example, the government cannot instruct a witness to refuse to be interviewed by the defense. But the defense

---

[6] The defendant ultimately has a right to cross-examine witnesses, but witness safety concerns are so paramount that even at trial, in some cases, the government need not provide a witness's real name. *See United States v. Ramos-Cruz*, 667 F.3d 487, 501 (4th Cir. 2012) (allowing witnesses to testify under pseudonyms given the possibility of violent retaliation).

12

cannot force the government to go out into the world, find a witness, and then make that witness available to the defense. This is particularly true if doing so might jeopardize that witness' safety. The defense can, today, investigate the charged crime, identify potential witnesses, and seek to interview them. If it does so, the government cannot instruct any such witnesses not to participate in the defense's investigation. But the government does not artificially restrict the defendant's access to a witness by not telling the defense that witness's name.

Similarly, Federal Rule of Criminal Procedure 16 does not require pretrial disclosure of potential prosecution witnesses. Rather, Rule 16's *exemptions* from general disclosure requirements include material that might contain sensitive witness information, such as statements of prospective government witnesses and reports created by government agents in connection with investigating or prosecuting the case. *See United States v. Fort*, 472 F.3d 1106, 1109-10 (9th Cir. 2007).

Also, *Brady v. United States*, 397 U.S. 742 (1970), has no effect on this analysis. There is nothing independently exculpatory about the names of the witnesses involved. The witnesses were children and known associates of Mayes who live in close proximity to the defendant. These witnesses have an obvious safety interest in their personal identifying information not being turned over to the defense team of a man who was charged by a grand jury with witness intimidation.

In this District, the United States generally follows an "open file" discovery policy that is more generous than the requirements of Rule 16. The "open file" policy is

memorialized in the Local Rules. Those Rules establish that, even when following its "open file policy," the government "retains the authority to redact from open file material anything … that the government reasonably believes … would jeopardize the safety of a person other than the defendant." Local Rule 16(a)(2). The Local Rules also provide that "open file" material does *not* include "material identifying confidential informants." Local Rule 16(a)(3).

Under the Local Rules, the defendant is permitted to challenge the government's redactions. Local Rule 16(a)(2). That challenge turns on whether the redacted material "identif[ies] confidential informants" – in which case the material is not subject to "open file" discovery at all – and, even if no confidential informants are involved, whether "the government reasonably believes [the redacted material] would jeopardize the safety of a person other than the defendant." Local Rule 16(a)(2), (a)(3). In this case, the government should prevail on both criteria: the government witnesses are protected as a "confidential informants," and therefore privileged; and even if not, the government "reasonably believes" that releasing their identities could "jeopardize [their] safety." The defense has not made, and cannot possibly make, a showing the government does not hold that belief reasonably and in good faith.

The defense will ultimately have a right to cross examine the government's witnesses and to pretrial disclosure of those witnesses' names. In this case, which is governed by the District Court's rules, the government will be required to turn over its witness list seven days before the pretrial conference (i.e., approximately one month

14

before trial). And should this case go to trial and any of the people whose names the defendant presently requests be included on the United States' witness list, the defense will then have those names. But, as has been explained by a number of courts in this circuit, defendants are not entitled to any more than that. Because the government has agreed to disclose on the terms addressed above, the defendant's request on this point is moot.

### III. The Personal Identifying Information of Confidential Informants is Privileged

As Local Rule 16(a)(2), (a)(3) recognize, the government has a "limited privilege" to withhold the identity of an informant from a criminal defendant. *United States v. Harris*, 531 F.3d 507, 514 (7th Cir. 2007) (citing *Roviaro v. United States*, 353 U.S. 53, 59-60 (1957)). "The government is granted this limited privilege as a right, and need not make a threshold showing of likely reprisal or retaliation against the informant in order to assert the privilege." *United States v. Valles*, 41 F.3d 355, 358 (7th Cir. 1994) (citing *Dole v. Local 1942*, 870 F.2d 368, 372 (7th Cir. 1989)). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Roviaro,* 353 U.S. at 59.

When determining whether to compel disclosure of an informant's identity, courts must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. "Whether a proper balance renders

15

nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *United States v. Andrus*, 775 F.2d 825, 841-42 (7th Cir. 1985) (quoting *Roviaro*, 353 U.S. at 62.). Relying on *Roviaro*, the Seventh Circuit has noted that "the defendant must establish a genuine need for disclosure before disclosure should be ordered." *Id.* at 842.

"[T]he nature of the CI's role [is] an important factor to consider when determining whether that informant's identity should be disclosed. *United States v. Wilburn*, 581 F.3d 618, 623 (7th Cir. 2009) (citing *Harris*, 531 F.3d at 515.) "[W]hen the confidential informant [is] a mere 'tipster'—someone whose only role was to provide the police with the relevant information that served as the foundation for obtaining a search warrant—rather than a 'transactional witness' who participated in the crime charged against a defendant or witnessed the event in question, disclosure would not be required." *Id*. In *Roviaro*, the Court required disclosure of a confidential informant who was the sole participant, other than the defendant, in the transaction charged against the defendant. 353 U.S. at 64. The Court found the informant's testimony "highly relevant" because he "had helped to set up the criminal occurrence and had played a prominent part in it." Just because a witness is a transactional witness it does not automatically justify disclosure of the witness' identity. *United States v. McDowell*, 687 F.3d 904, 911 (7th Cir. 2012). The defendant would still need to establish that knowing that the witness' identity is "relevant and helpful to his defense or is essential to a fair determination of a cause," *Wilburn*, 581 F.3d at 623.

SOIs 7 and 10 plainly fall into the "transactional witness" category. SOIs 1, 2, 4, 5, 6, 8, and 9 could arguably fall into the "transactional witness" or "tipster" categories. Nonetheless, for these witnesses, the government has already provided the substance of the witnesses' statements, and the defendant has failed to establish a legitimate reason why the witnesses' identities is relevant or essential to his defense.

SOIs 3, 11, 12, and 13 plainly fall into the "tipster" category. They are all civilian "tipsters" who voluntarily told police about suspicious activity, which proved relevant to a crime and served as background to the investigation or as part of the basis for filing a complaint and obtaining an arrest warrant. These are witnesses who did not participate in the specific crimes with which Mayes is charged, and they become involved through no choice of their own – they merely witnessed parts of the surrounding events and then cooperated with a law enforcement investigation. When, as here, "the confidential informant [is] a mere 'tipster'," the Seventh Circuit has stated that "disclosure [of identity] would not be required." *United States v. Wilburn*, 581 F.3d 618, 623 (7th Cir. 2009) (citing *Harris*, 531 F.3d at 515). Again, for these witnesses, the government has already provided the substance of the witnesses' statements, and the defendant has failed to establish a legitimate reason why the witnesses' identities is relevant or essential to his defense.

Mayes has the full set of reports, search warrant materials, witness statements, and video evidence. Mayes has not identified any pressing need to have the SOIs' names prior to the normal process identified by the District Court. In his brief, the defendant showed

how he has already used those statements to prepare his defense – Mayes discusses multiple statements that he believes to be inconsistent and/or impeachable. The defendant has not offered anything beyond speculation that talking to these witnesses could reveal something more than what they have already stated. The concern for the witnesses' safety clearly outweighs the defendant's unformed reasons for additional interviews.

### IV. The Government Reasonably Believes That Redacting The Witnesses' Names Will Help Protect Their Safety

A grand jury has indicted Mayes with intimidating witnesses, teaching children and others how to make Molotov cocktails, conspiring with others to firebomb a police station, using a destructive device, encouraging people to riot, making a firearm, and being a felon in possession of a firearm. Mayes has repeatedly intimidated and interfered with witnesses and abused his mentoring responsibilities to children by encouraging them to attack police and teaching them how to make Molotov cocktails. Mayes now seeks premature disclosure of the personal identifying information of citizen witnesses who have provided information to law enforcement regarding his criminal activities. Criminal Local Rule 16(a)(2) allows the government to protect citizen witnesses by use of the redaction process.

Criminal Local Rule 16(a)(2) states: "the government retains the authority to redact from open file material anything . . . that the government reasonably believes . . . would jeopardize the safety of a person other than the defendant." In these circumstances, the

government has taken the reasonable step of redacting these witnesses' full name from reports, while still producing full statements in reports to Mayes pursuant to the "open file" policy. That limited redaction protects witness safety while still providing Mayes with all of the substantive evidence against him. The names of these witnesses are not exculpatory evidence.

In order for the defense to make any use of witness names, defense investigators would need to go out into the community on behalf of Mayes in order to run down the named witnesses. Those names would then, necessarily, be put out into the community and come to the attention of the witnesses' and the defendant's family and associates, which would expose the witnesses to a serious threat that Mayes has already shown that he is willing to employ.

The United States Attorney's Office for the Eastern District of Wisconsin typically abides by its "open file" policy. It is an unusual policy within the Department of Justice, and it depends heavily on the safety-driven redaction rights retained by the government and on the exclusion of confidential informant information. If the government is unable to withhold information identifying confidential informants or protecting citizen safety from reports to which the defense would not be entitled absent the "open file" policy, then the government may be forced to join nearly every other United States Attorney's Office in the country and abandon that policy. Furthermore, there is no trial date set in this case, so it would be unsound to jeopardize innocent people's safety indefinitely as this case moves through the pretrial process.

Dated at Milwaukee, Wisconsin, this 26th day of June, 2020.

                                              Respectfully submitted,

                                              MATTHEW D. KRUEGER
                                              United States Attorney

By:    */s/ Christopher J. Ladwig*

                                              CHRISTOPHER J. LADWIG
                                              Assistant United States Attorney
                                              Attorney for Plaintiff
                                              Office of the United States Attorney
                                              Eastern District of Wisconsin
                                              517 East Wisconsin Avenue, Room 530
                                              Milwaukee, WI 53202
                                              Telephone: (414) 297-4103
                                              Fax: (414) 297-1738